## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANKLIN STYER,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil No. 1:13-CV-833** |
| | : | |
| **v.** | : | **Judge Yvette Kane** |
| | : | |
| **FRITO-LAY, INC.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

The plaintiff, Franklin Styer, instituted this workplace discrimination action on April 2, 2013, by filing a complaint, through counsel, alleging, *inter alia*, that his former employer Frito-Lay, Inc. ("Frito-Lay"), violated Title VII of the Civil Rights Act of 1964 by creating and maintaining a hostile work environment, engaging in retaliatory harassment of the plaintiff and discriminated against the plaintiff based on race, all of which Styer claims resulted in his involuntary resignation.  The complaint was later amended to include additional facts and to identify the date on which Styer received a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC).  (Doc. 12.)   The plaintiff's claims all relate to a series of incidents or

occurrences that he encountered as a forklift operator at a Frito-Lay plant in York, Pennsylvania.

Currently pending before the court is the defendant's motion for summary judgment pursuant to Federal Rules of Civil Procedure 56(a). (Doc. 44.) The motion has been fully briefed and referred to the undersigned for purposes of preparing a report and recommended disposition. For the reasons that follow, we find that summary judgment should be entered in Frito-Lay's favor with respect to the plaintiff's retaliation and constructive discharge claims. Although we previously recommended that these claims be permitted to survive a motion to dismiss, upon further review of the claims and the evidence from the administrative proceedings that the plaintiff initiated, it is now apparent that these claims were not presented to the EEOC or the PHRC and, in any event, are distinct from the discrimination claims that Styer brought.

Moreover, we find that the evidence of the disparate collection of isolated, and in some instances unsubstantiated, incidents of alleged discrimination, harassment, and retaliation fail to provide adequate support for Styer's claims. Although the plaintiff's brief opposing summary judgment is forceful and goes to considerable lengths to create the appearance of disputed issues of fact, it is ultimately unavailing. In particular, we are constrained to note that in an effort to demonstrate material

disputes in the evidence, the plaintiff has relied upon his own belated declaration that

conflicts in many significant ways, about many material facts, from the information

he supplied during a sworn deposition given earlier in the case.[1]

_____

[1] It is recommended that Mr. Styer's belated declaration, which is offered in material contradiction to his own earlier sworn deposition, should not be considered by the Court because it is a sham, and inappropriate under the Federal Rules of Civil Procedure. "[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Jiminez v. All Am. Rathskeller, Inc.,503 F.3d 247, 251 (3d Cir. 2007) (citing Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004)).  The defendant has filed a reply brief that thoroughly and accurately documents the numerous instances in which the plaintiff's later-filed declaration is materially inconsistent, in an apparent effort to create the appearance of a disputed issue of fact in the record.  In such circumstances, courts should apply the "sham affidavit doctrine."  Id. at 253.  The doctrine is equally applicable to declarations, which may be submitted under Rule 56.  See In re Chocolate Confectionary Antitrust Litig., 73 Fed. R. Serv. 3d 1378, *3 n.6 (M.D. Pa. 2009).

The Third Circuit has explained that a sham affidavit "is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant . . . . Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate."  Id.  In cases where a party has failed to "explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition."  Id.  The plaintiff has not offered any plausible explanation for the subsequent declaration, or the materially contradictory facts he posits, and thus it

Furthermore, the brief purports to take support from two additional declarations given by co-workers who were themselves never identified in Rule 26 disclosures or during any other time in this action, thus precluding Frito-Lay from deposing these new declarants.  Moreover, those belated declarations were given by employees who seem later to have disputed some of the representations made in the declarations, which were drafted by the plaintiff's counsel, and which were never signed by the declarants, further undermining their probative value and instead raising questions about their veracity.[2]

---

is submitted that the Court may and should disregard the subsequent declaration and find that it has no probative value in this case.

[2] The Court should also disregard these declarations, for a host of reasons.  First, the defendant has demonstrated that in the case of both declarants, substantial questions exist regarding the veracity of the representations being made – which appear to have been drafted by counsel, were not actually signed by the declarants, and were submitted even though the declarants seem to have indicated that not all of the representations were factually accurate.  But it is unnecessary to engage in a parsing of the declarations themselves, or to inquire more deeply into the manner in which the declaration were obtained, prepared, and submitted, because it is undisputed that neither of the declarants was ever identified by the plaintiff in Rule 26 disclosures or at any other point during the litigation aside from some passing reference during his deposition that would have been insufficient to place the defendant on notice that the plaintiff might later be relying on a declaration from either person.  Rule 26 requires a party to disclose the names of all individuals likely to have discoverable information in a case.  Fed. R. Civ. P. 26(a).  Parties must supplement these disclosures if initial disclosures are incomplete.  Neither Michael Hester-Bey or Terry Hightower were identified in the plaintiff's June 27, 2013 Rule 26 disclosures.  It does not appear that the plaintiff ever supplemented his disclosures to identify these declarants.

What is equally if not more troubling is that such belated evidence is being offered by the plaintiff in a case that has been riddled with contentious discovery, multiple extensions of the discovery periods, and which has already resulted in the court striking an expert report and precluding the expert from giving expert testimony that was belatedly disclosed by the plaintiff a day before the close of discovery. (Doc. 73.) It is thus surprising that following the court's prior admonitions, the plaintiff has again attempted to rely on declarations that either materially contradict earlier sworn deposition testimony, or which are belatedly offered from purported witnesses who were never previously identified or disclosed, and who themselves appear to have discredited at least some of the representations made in declarations that were never

---

Furthermore, pursuant to Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). In this case, there is no indication that the failure to identify the declarants earlier in the litigation was harmless, but instead seems to have been a last-ditch effort to supply evidence in an effort to create the appearance of disputed issues in the record, and at a time when the defendant would have no opportunity to question those witnesses. In such cases, courts have seen it appropriate to preclude such testimony. See, e.g., 165 Park Row, Inc. v. JHR Dev., LLC, No. 2:12-CV-106, 2013 WL 633403 (D. Me. Feb. 20, 2013); Hagan v. California Forensic Med. Grp., Civ No. S071095, 2009 WL 689740 (E.D. Cal. 2009). It is recommended that the same practice be followed in this case, where the declarants should have been identified, but were not until the plaintiff's brief filed in opposition to summary judgment, and well past the discovery cutoff in this case, in an apparent effort to stave off summary judgment.

corrected by counsel, in order to contest summary judgment. Particularly problematic is that it appears that the declarants never actually signed the declarations that they are purported to have given, but that counsel instead submitted the declarations after failing to make corrections that the declarants attempted to have made with respect to the declarations that they had been given to review. These declarations should not be considered by the court, and in light of their tardy disclosure and questionable reliability, should instead be stricken. To the extent the declarations are to be considered, it is notable that in at least one of them from Terry Hightower, the declarant has submitted a new declaration that clarifies some of the earlier misrepresentations contained in his initial declaration, and which substantially undermine its evidentiary value. (Doc. 63, Ex. A.)

When stripped of the plaintiff's own materially inconsistent sham affidavit that has been offered in marked contradiction to his own sworn deposition; and stripped of the declarations of the plaintiff's co-workers, the record that remains compels a finding that summary judgment in the defendant's favor is warranted. The record makes clear that the plaintiff was very unhappy with his work environment and his treatment at work over a period of approximately 18 months, and that he perceived a number of events or occurrences during this time with Frito-Lay to have been racially insensitive or discriminatory. In some of these instances, the record simply does not

6

reveal any apparent racial animus at all, aside from the plaintiff's own interpretation and subjective belief that he was being singled out because of his race.  In other instances, the plaintiff alleges that some article of his personal property or work property had gone missing, or that his car or other property had been tampered with in some way, and he alleges that these instances were also evidence of racial discrimination; but the record is silent as to who (if anyone) interfered with the plaintiff's property, and provides no support for the plaintiff's claim that the conduct was racially discriminatory or harassing.  In the face of other objective evidence of record, the plaintiff's own subjective interpretation of events, without more, is not sufficient on this record to support his claims of workplace discrimination or retaliation.

Furthermore, the plaintiff has attempted to impose upon Frito-Lay liability on the basis of *respondeat superior*, in part by claiming that Frito-Lay failed appropriately to address or respond to racially discriminatory or harassing conduct by its employees  Yet, as will be discussed, the record that has been presented shows without any dispute that Frito-Law was consistently responsive to the plaintiff's complaints; that Frito-Lay's human resources personnel looked into and investigated his claims, but were generally unable to discern any evidence to support those claims; and that Frito-Lay's human resources personnel went to considerable lengths to speak

with and work with the plaintiff regarding his many grievances about the workplace.

Far from evincing unresponsive and ineffective management, the record shows

precisely the opposite and does not provide sufficient support to demonstrate that

Frito-Lay would have supervisory liability for these claims, which themselves lack

sufficient evidence to show discrimination, harassment or retaliation.

For these reasons, as explained more fully below, it will be recommended that

the court grant Frito-Lay's motion for summary judgment and close the case.

**B.**   **DISCUSSION**

   **A.**   **Summary Judgment - Rule 56**

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each
> claim or defense – or the part of each claim or defense – on
> which summary judgment is sought.  The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its

existence of nonexistence might affect the outcome of the suit under the applicable

substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408,

412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

9

Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  Id.  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252; see also Big Apple BMW, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant.  In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id.  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

### B.     Plaintiff's Claims for Retaliation and Constructive Discharge Fail Because These Claims Were Not Administratively Exhausted

A threshold issue before this court is whether the plaintiff has exhausted all of his statutorily mandated administrative remedies before he filed suit in federal court, particularly pertaining to the alleged retaliation and constructive discharge from employment with Frito-Lay.  Title VII of the Civil Rights Act of 1964 prescribes certain administrative remedies and procedures that must be followed and exhausted before an aggrieved employee may bring a civil action in court.  See 42 U.S.C. § 2000e-5.  Relevant to this litigation, the statute requires that an administrative charge be filed with the EEOC or a parallel agency, such as the PHRC prior to proceeding to federal court.  Id.

Frito-Lay previously moved to dismiss this action on the grounds that Styer failed to fully exhaust these administrative remedies, because he did not amend his administrative complaint to allege subsequent acts of retaliation and constructive discharge, acts which are alleged to have occurred after the EEOC proceedings commenced.  In this case, Styer filed an administrative complaint jointly with the EEOC and the PHRC and subsequently amended that administrative complaint. Styer filed his amended administrative complaint approximately one month before he resigned from his position with Frito-Lay, and perhaps as a result the alleged

retaliation and constructive discharge allegations were not included in that amended administrative complaint.   However, plaintiff argues that the retaliation and constructive discharge allegations were closely related to the harassment allegations he did raise in his amended complaint, and as such he maintains that he was not required to amend his complaint with the PHRC any further to include the retaliation and constructive discharge allegations.

In order to determine if a complaining party has properly exhausted his administrative remedies prior to bringing suit, courts are to examine "whether the acts in the subsequent Title VII suit are fairly within the scope of the prior [agency] complaint or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996); see also Anjelino v. New York Times Co., 200 F.3d 73, 93 (3d Cir. 2000) ("[S]uits in the district court are limited to matters of which the EEOC has had notice and a chance, if appropriate, to settle.").   In addition, the court of appeals has explained that while these preliminary steps to filing suit are both important and necessary, they are to be interpreted in "a nontechnical fashion." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976).   Moreover, the statute provides that the aggrieved employee should file charges that would put the employer on notice of the claims against it. See 42 U.S.C. §2000e-5(e).   Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of

the EEOC investigation which can reasonably be expected to grow out of the charge, including new acts which occurred during the pendency of proceedings before the Commission.  Id. at 398-99 (citations omitted).

Further, in construing this exhaustion requirement, courts have recognized that workplace conditions do not remain static while an EEOC inquiry is on-going. Therefore, the courts have not interpreted this exhaustion requirement in a rigid and mechanical fashion requiring the plaintiff to alert the court to every new grievance or concern which arises in the workplace.  As the court of appeals has explained:

> Where discriminatory actions continue after the filing of an EEOC complaint, however, the purposes of the statutory scheme are not furthered by requiring the victim to file additional EEOC complaints and re-starting the 180 day waiting period.  This court has recognized this fact in permitting suits based on new acts that occur during the pendency of the case which are fairly within the scope of an EEOC complaint or the investigation growing out of that complaint, without requiring the victim to file additional EEOC complaints and wait another 180 days to sue.  See Hicks v. ABT Associates, 572 F.2d 960, 966 (3d Cir.1978); Ostapowicz v. Johnson, 541 F.2d 394, 399 (3d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). See also Gupta v. East Texas State University, 654 F.2d 411 (5th Cir. Unit A 1981). The rationale behind these decisions is that once the EEOC has tried to achieve a consensual resolution of the complaint, and the discrimination continues, there is minimal likelihood that further conciliation will succeed.  This slim likelihood of successful conciliation does not justify forcing the victim to wait an additional 180 days to file suit.  The relevant test in determining whether appellant was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.  See Hicks, 572 F.2d

at 965-66; Ostapowicz, 541 F.2d at 398-99; Gamble v. Birmingham
Southern Railroad Co., 514 F.2d 678, 689-90 (5th Cir.1975).

Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).

"Factors the district court may consider in making this determination include . . .
whether the previous . . . complaints alleged the same retaliatory intent inherent in the
retaliatory discharge claim, Waiters, 729 F.2d at 238, . . . ; and . . . whether the EEOC
should have been put on notice of [the] claim of retaliatory discharge and therefore
investigated that claim." Robinson v. Dalton, 107 F.3d 1018, 1026 (3d Cir. 1997).

In the case before the court, the defendant has challenged the inclusion of the
plaintiff's claims of retaliation and constructive discharge in this civil action, arguing
that these claims were not fairly within the scope of the claims alleged in the plaintiff's
administrative complaints.  It is undisputed that Styer filed his complaint with the
EEOC and PHRC prior to leaving Frito-Lay and never amended the complaint after
he left the company to include specific claims for retaliation and constructive
discharge.  Nevertheless, plaintiff has argued that the constructive discharge and
retaliation counts are reasonably within the scope of the underlying allegation of a
hostile work environment, and that the retaliation and constructive discharge claims
arose out of the underlying hostile work environment allegations and subsequent
administrative proceedings.  In essence, Styer argues that the combination of events

that transpired and ended with what he claims was a constructive discharge effectively put Frito-Lay, the EEOC and the PHRC on notice of all claims raised in this lawsuit.

In Styer's complaint and subsequent amended complaint he alleges that the pervasive discrimination he experienced from his supervisors and co-workers was continuous for a period exceeding one year. The plaintiff enumerates many instances of alleged discrimination in the workplace, including racial slurs being directed at him, tampering with his equipment, and hiding the keys to his forklift. Plaintiff avers that he reported each incident to his superior to no avail, and further states that he was subject to additional acts of discrimination following these reports, a factual chronology which may give rise to an inference of retaliation.

Styer resigned from his position with Frito-Lay approximately one month after filing his amended complaint with the PHRC and EEOC. Because it appears that these agencies were actively investigating Styer's hostile work environment claims when Styer resigned from his position, in our prior recommendation we concluded that this on-going agency investigation could potentially have embraced the circumstances of Styer's separation from his employment. We further noted, however, that if the EEOC administrative record showed that is conclusion is in error, the defendant remained free to file a properly documented summary judgment motion addressing this claim. We also found that the chronology of Styer's complaint, which alleges acts of

discrimination, both before and after Styer brought his concerns to the attention of management, might permit an inference that the EEOC investigation examined acts of discrimination and retaliation in the workplace, since hostile acts occurring after an employee complains may give rise to a inference of retaliation for those complaints.

In considering the prior motion to dismiss, at an earlier stage of litigation, where we were presented with an incomplete factual record, the court was unable to conclude that the plaintiff's claims for retaliation and constructive discharge, which are based on conduct occurring shortly after he initiated administrative proceedings, and which bear substantial relation to the underlying charge of workplace discrimination, did not fairly fall within the scope of the plaintiff's administrative claims. For that reason, we declined at that time to embrace the defendant's argument made on a motion to dismiss where we could only consider the pleadings that the plaintiff's technical failure to bring additional allegations of retaliation, discrimination and eventual discharge through a second amended complaint should result in the complete dismissal of these claims from this action. However, we also noted that to the extent additional facts were developed to show that the plaintiff's claims of retaliation and constructive discharge fell so far outside the scope of the administrative investigation into his claims that it cannot reasonably be considered to have been within the administrative agencies' investigations, the defendants could raise this issue again at summary

judgment.  They have now done so, and have presented a compelling showing that summary judgment is indeed warranted.

Thus, the plaintiff confirmed in his deposition testimony that the only contact he had with the PHRC, after filing his amended PHRC complaint on April 13, 2012, was to request a right-to-sue letter.  (Doc. 47, Ex. A, Dep. of Franklin Styer ("Styer Dep."), at pp. 236-237.)  He confirmed that he provided no additional facts to the PHRC regarding his resignation from his employment, which occurred a little over one month later, on May 18, 2012.  (Styer Dep., p. 237.)  Styer has, in his brief opposing the defendant's motion, endeavored to supply additional facts, or argument, to show that he did have contact with the PHRC, and that PHRC representatives simply failed to respond to his inquiries.  Thus, in his brief Styer states:

> Plaintiff was in contact with PHRC at various points, trying to get a status.  He told Ms. Waters, the PHRC investigator, that he had left Frito-Lay in May 2012 because of the work environment.  Ex. A., Styer declaration ¶ 95.  In early September 2012, plaintiff wanted to submit additional documents and materials to the PHRC, and Waters told him not to submit anything, that "there is nothing to do at this point." Ex. A., Styer declaration ¶ 96.  Dissatisfied with the PHRC investigation, plaintiff wrote to Waters on September 7, 2012 and requested a substantial weight review . . . Ms. Waters stopped taking his calls . . . the Commission violated its own regulations.

(Doc. 57, Pl. Br. at pp. 19-20.)  What the plaintiff is apparently attempting to do is to make a record showing that while he diligently attempted to get information from the

PHRC and to aid in the investigation, it was the agency that dropped the ball and thus he should not be penalized for its inaction or failure to comply with its own investigatory obligations. In this way, the plaintiff seeks to liken his case to that of Hicks v. ABT Associates, 572 F.2d 960 (3d Cir. 1978) and Ostapowicz v. Johnson Bronze Company, 541 F.2d 394 (3d Cir. 1976), cases in which the Third Circuit Court of Appeals found that Title VII plaintiffs had tried to amend administrative claims to include new theories of discrimination, but were stymied or frustrated by the EEOC's improper conduct during the administrative process. In those cases, the Court of Appeals found that a plaintiff should not be prejudiced in bringing the new claims in a Title VII action because he or she tried to do so administratively and were essentially prevented from doing so by the agency.

The problem with this argument, in this case, is that there is no actual evidence to show that the PHRC or EEOC acted inappropriately with respect to Styer's discrimination claims, and there is no evidence aside from the plaintiff's own belated declaration in which he attempts to show that he was diligently pursuing his claims and somehow endeavored to include claims for retaliation and constructive discharge but was nevertheless prevented from doing so. The defendants have represented, and the plaintiff has not effectively contested, that there is no reference at all in the plaintiff's PHRC file to indicate that the plaintiff claimed that he had been forced to

18

resign his employment, or that the allegedly harassing conduct complained about was retaliatory, as well as discriminatory, in motive.

As Frito-Lay observes, a claim for retaliatory harassment under 42 U.S.C. § 2000e-3 requires proof of a retaliatory, as opposed to a discriminatory motive, thus distinguishing it from a claim of discriminatory harassment under 42 U.S.C. § 2000e-2. See Jensen v. Potter, 435 F.3d 444, 449-50 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). In keeping with other claims for retaliation, in a claim for Title VII retaliation, a plaintiff must demonstrate that he engaged in legally protected conduct and thereafter was subjected to a materially adverse employment action, and that a causal connection existed between the protected conduct and the adverse action. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997) (quoting Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995)). Frito-Lay argues, and the plaintiff does not really dispute, that there is no evidence anywhere in the PHRC filings that the plaintiff alleged to have engaged in legally protected conduct that was causally connected to the treatment that he claims caused him to separate from his employment. The total absence of evidence that such a claim was advanced, and the fact that claims for retaliation have legal requirements that distinguish them from claims for

discrimination, causes us to find that the plaintiff never raised or exhausted a Title VII retaliation claim.

In order to bring a claim for constructive discharge, in turn, the Third Circuit has explained that a plaintiff must show that his employment had terminated and that "the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person subjected to them would resign." Mandel v. M&Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)). Additionally, in order to prove constructive discharge, a plaintiff must show "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (citing Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)). There is nothing in the record to show that the plaintiff ever informed the PHRC that he had resigned his employment, or that he felt forced to do so by the conditions existing in the workplace.

Although the court previously held open the possibility that the plaintiff would be able to show that he had exhausted his administrative remedies with respect to claims for retaliation and constructive discharge, it is now evident that he did not do so, and he has not come forward with any competent evidence aside from his own belated declaration to demonstrate that he did, in fact, exhaust these claims; or,

alternatively, that he endeavored to exhaust these claims and was somehow prevented from doing so by a failure of the PHRC's own investigation.   Frito-Lay has represented that there is no mention anywhere in the administrative record to show that the plaintiff ever brought such claims, and the plaintiff has not countered this assertion in a substantive fashion.   It is, therefore, recommended that the court enter summary judgment in Frito-Lay's favor with respect to the claims of retaliation and constructive discharge.   In the alternative, as discussed below, Frito-Lay is entitled to summary judgment on these claims on their merits.

**C.     Plaintiff's Claims for Racial Harassment and Retaliatory Harassment Fail to State a Claim Because the Evidence of Record is Insufficient to Show that the Conduct Complained of was Severe or Pervasive**

The plaintiff has alleged 11 separate alleged workplace incidents that he claims constituted harassment or discrimination, and gave rise to a hostile work environment at the Frito-Lay plant on the third shift.   He claims that each of these events was caused by fellow hourly workers, who made comments or engaged in actions that were motivated by the plaintiff's race, or which were carried out in retaliation for his complaining to management about his co-workers. (Styer Dep. at pp. 272-275.) Frito-Lay has gone through each of the alleged instances of discrimination and retaliation, and through the plaintiff's own sworn testimony regarding the incidents, as well as

other record evidence that was adduced during discovery, to address them *seriatim* and argue why none on their own or in combination give rise to an actionable violation under Title VII.  Because of the specificity of the allegations, and the proof that has been adduced in support of those claims, we will also discuss each alleged occurrence separately.  In doing so, we are mindful that the plaintiff is also complaining that he perceived his overall work environment to be hostile, and not isolated to discrete incidents.  However, he has endeavored to prove a hostile work environment existed on the basis of distinct incidents, and we, therefore, are constrained to examine each under the prevailing legal standards in this field, while considering the evidence as a whole.  As will be detailed, much of the evidence discrediting the plaintiff's allegations, and demonstrating that there are no actual material disputed issues of fact that would preclude summary judgment come directly from the plaintiff's own sworn testimony.

### 1.    First Alleged Incident

Mr. Styer first alleges that two of his fellow co-workers deleted information from an employee electronic tracking system tasks or functions that he had completed, in order to degrade his Employee Performance ("EP") efficiency rating – something that had a negative effect on his job evaluations.  (Styer Dep., p. 112.)  During his deposition, the plaintiff acknowledged that he did not have any actual facts to show

that these employees, or anyone else, manipulated his EP in the company's system. (Styer Dep., p. 119.)  The plaintiff did testify that his EP was wrong, (Id., p. 113), and it is clear he suspected that somebody was tampering with his information in order to harm his employee rating.  Accordingly, the plaintiff brought his concerns to Peter Hall, a supervisor, who proceeded to examine the system and found that nobody had accessed the system to delete or alter the tasks that the plaintiff claims to have completed.  (Styer Dep., pp. 114, 116; Appendix, Ex. E, Dep. of Peter Hall ("Hall Dep.").)  Additionally, Mr. Styer attested that he complained that he had never been properly trained in the use of the electronic tracking system.  (Styer Dep., pp. 113-114.)  Notably, upon receiving this complaint, Mr. Hall took steps to have the plaintiff's probationary period extended – which was, in fact, a benefit to the plaintiff because it provided him an additional two weeks of training in the use of the system, which the plaintiff found helpful, and which resulted in his EP being brought into an acceptable range.  (Styer Dep., pp. 115, 118.)  Thus, in the absence of evidence of any actual tampering of the system, or any proof that two of his co-workers did as he claims they did – and no evidence at all that such tampering was racially motivated – the evidence instead shows that Frito-Lay personnel were responsive to Mr. Styer's complaints; they investigated his allegations and found them to be unfounded; and

they offered him additional time and training, which the plaintiff concedes was helpful.

In his brief opposing summary judgment, the plaintiff has attempted to create the appearance of a disputed issue of fact by declaring that coordinators or other authorized personnel "could alter a handler's EP numbers by accessing the system in the office, by changing break times, the time between pick-ups and product scans, production board numbers and battery charges." (Styer Declaration ("Styer Decl."). ¶ 15.) There is no actual evidence to support this claim, and the plaintiff does not persuasively explain how he can make such an attestation, or what it could possibly be based upon, which is especially dubious given the plaintiff's acknowledged limited familiarity with the system and the way it works. Indeed, the defendant has pointed out that the assertion is inaccurate as a matter of fact; and that the only information that a coordinator could change was to add or remove a break key. (Heiss Dep., pp. 178-79; Ex. 6, Dep. of Michael Dube, pp. 48, 50.) Frito-Lay does not dispute that "break keys", which are entered when an employee stops doing forklift work and goes on break or does a non-forklift work, could be adjusted. (Heiss Dep. p. 180.) What the plaintiff had originally claimed is that co-workers were tampering with the system in order to drive up his EP – something Frito-Lay has demonstrated is simply not possible, and something which the plaintiff now seems to concede. Instead of having

24

proof of the change he alleged was made, the plaintiff in his declaration has now seemed to assert that coordinators altered different information, but he has no evidence to support this belated contention.[3]

### 2.    Second Alleged Incident

The plaintiff next contends that in March 2011, the keys to his forklift were missing.  He claims he approached Mike Dube, a co-worker, to complain about the matter, and that Dube responded, "what is it with you people?" (Styer Dep., pp. 123-24.)  The plaintiff construed the use of the phrase "you people" as a racially-offensive comment, and proceeded to complain to Marybeth Heiss, the Warehouse Business Unit Leader.  In response, Ms. Heiss met with the plaintiff, Mike Dube, and Nicki Brendel, who was their supervisor, in order to address the claim.  (Styer Dep., p. 127.) It appears from the record that this intervention succeeded in putting a stop to the use of such phrases, since there is no indication that the plaintiff heard Mr. Dube or others making such statements in the future.

---

[3] The plaintiff also purports to attest in his declaration filed in opposition to the defendant's motion that no Caucasian employee had ever had inaccurate EP numbers, but he provides no basis for the Court to conclude that he would have any knowledge of this.  Frito-Lay points out that over 17 months of discovery, the plaintiff did not seek any such information, and the plaintiff has not cited to anything other than his own unsupported declaration in support of this alleged fact.

In the plaintiff's later filed declaration he contradicts his deposition, in which he acknowledged that Frito-Lay management met with him and Mr. Dube about the matter to address the plaintiff's concerns; in the declaration, the plaintiff claims that nothing was done. We do not find that this contradiction should be read as creating a legitimate dispute in the record, since the plaintiff previously swore that the matter was addressed and, apparently, it was effective.

### 3.    Third Alleged Incident

The plaintiff claims that a month after the encounter with Mike Dube, some unidentified employee tampered with his forklift by "snatch[ing] the wires out," which caused the lighting system on the forklift to become unusable. (Styer Dep., pp. 131, 133-34.) The plaintiff again complained to Ms. Heiss, who the record shows reviewed videotaped footage to determine who may have done what the plaintiff alleged. (Styer Dep., p. 139, Heiss Dep., p. 186.) In addition, the plaintiff acknowledged that Ms. Heiss interviewed other workers at the facility about the matter in order to determine if the equipment had been tampered with. (Styer Dep., pp. 138-39.) Notably, Ms. Heiss interviewed a forklift mechanic, who informed her that forklift lights often do stop working, but that in the case of Mr. Styer's forklift, he could find no evidence of tampering. (Heiss Dep., p. 193.) The plaintiff nevertheless claimed that a specific co-worker, Warren Hamilton, had torn out the wires, but seems to have had no evidence

other than his own conjecture that this was so.  When he was questioned during his

deposition why he believed Mr. Hamilton had done such a thing, he answered that he

believed Mike Dube had told him to.  (Styer Dep., pp. 134-35.)  Yet, when pressed

further as to how he knew this was true, or how he came to believe that Mr. Dube had

given such an instruction, Mr. Styer admitted that he had no evidence other than his

own belief that this was what happened.  (Styer Dep., p. 135.)  The record fails to

support a claim that someone intentionally tampered with the plaintiff's forklift lights,

much less that any alleged tampering was done for discriminatory reasons based upon

the plaintiff's race.  In short, we do not believe that in this instance Styer can create

a genuine issue of material fact by simply denying his own prior sworn testimony.

### 4.     Fourth Alleged Incident

Next, the plaintiff contends that John Snelbaker, a white co-worker with whom

the plaintiff claimed to have been friendly, learned that the plaintiff had been assigned

to work on matters for the Association of International Bakers, or "AIB", and twice

that evening referred to the plaintiff as the "AIB bitch." (Styer Dep., pp. 141-42, 144.)

The plaintiff has attested that referring to an African American male as a "bitch" is

extremely insulting.  The plaintiff acknowledged during his deposition that he did not

know whether it would be equally insulting to a white man, (Styer Dep., pp. 143-44),

and when asked why Mr. Snelbaker would have called him that name, he speculated

that Snelbaker was actually frustrated with Ms. Heiss for making work assignment decisions for the plaintiff instead of by Snelbaker himself, as a coordinator (Id., p. 144). Again, the plaintiff complained to Ms. Heiss, who convened a meeting with the plaintiff and Snelbaker, after which he never again referred to the plaintiff as a bitch. (Id., pp. 144-45.) The evidence thus contains very little, aside from the plaintiff's subjective impression, that this isolated incident was racially motivated, and the record confirms that the matter was addressed effectively.

### 5.    Fifth Alleged Incident

The plaintiff claims that another of his co-workers, Rich Rosenzweig, told him to "get the fuck off the lift" after mistakenly believing that the plaintiff was operating a forklift that had been taken out of service. (Styer Dep., pp. 145-46.) Although the plaintiff perceives that there was some racial hostility in this exchange, it is not evident from the record. Indeed, when asked why he believed Mr. Rosenzweig would speak to him in that manner, the plaintiff simply said he believed that Rosenzweig was angry that the plaintiff was operating a forklift that he thought was out of operation, and because the plaintiff ignored his demands. (Id., pp. 147-48.)

Again, the plaintiff complained of this incident to Ms. Heiss, who again convened a meeting to address the matter. This meeting was attended by the plaintiff, Rosenzweig, Heiss and another supervisory employee, during which Rosenzweig

apologized and explained that he had been angry. (Styer Dep., p. 149.) Notably, the plaintiff claimed that before the incident, he had a good relationship with Rosenzweig, and he further testified that he had a good relationship with him after their meeting. (Id., pp. 147, 149.) Thus, the plaintiff claimed that he was surprised by Rosenzweig's outburst because "he and I had a great – for five years, he and I had a great relationship." (Id., p. 147.) When he was asked about their relationship afterward, the plaintiff testified that the two men got along "[l]ike we did prior to it." (Id., p. 149.) This testimony is far different from that belatedly offered in the plaintiff's declaration, in which he now claims that "I enjoyed no relationship with Rosenzweig after this, but he temporarily stopped cursing at me which was good." (Styer Decl. ¶ 27.)

We do not find that the plaintiff's allegation that Rosenzweig's outburst was racially motivated has any evidentiary support, and we do not find that the plaintiff's effort to alter his prior testimony to suggest that he and Rosenzweig had "no relationship" after this incident is sufficient to create an issue of fact since it is contradictory to his prior testimony and, in any event, does not provide any evidence of racial animus.

###     6.     Sixth Alleged Incident

The plaintiff's perceived problems at work continued through 2011. Thus, in August 2011, the plaintiff claims that the forklift that he usually used was missing

from its normal place.  (Styer Dep., p. 151.)  The record shows that forklifts are used by handlers on all three shifts at the plant, and are not assigned to any particular employees. (Heiss Dep., p. 146.)  There is no evidence at all to show that this incident had anything to do with the plaintiff's race, and even the plaintiff admitted during his deposition that he had no idea who might have used the forklift or why it had been returned to a different location.  (Id., p. 153.)  This incident simply does not provide any support for the plaintiff's contentions in this case and seems to have been included to create the appearance that the plaintiff encountered suspicious mistreatment that he attributed to his race in many areas of his day-to-day experience at Frito-Lay but which, upon examination, seem to have no perceptible relation to the plaintiff's race, or to have been motivated to harass for any reason.

### 7.    Seventh Alleged Incident

The plaintiff also claims that his personal property – most importantly, his car – was being tampered with while parked in the lot at work.  This caused the plaintiff considerable anxiety and stress.  He claims that one time while his car was parked, someone caused certain fluid to be drained from it.  (Styer Dep., p. 157.)  As was his practice, the plaintiff notified Ms. Heiss about the incident, this time by voicemail. (Styer Dep., pp. 157, 197.)  The plaintiff acknowledges that as soon as she picked up the message, Ms. Heiss contacted the plaintiff while he was at the mechanic and

informed him that she would investigate the matter.  (Styer Dep., pp. 157-58.) Additionally, Ms. Heiss invited the plaintiff to have his mechanic notify her if he found evidence of vandalism.  (Id., p. 158.)  During their conversation, the plaintiff told her of another incident involving his car, when he claimed that he discovered cigarette burns on the body, and that he had brought this claim to the attention of Jay Schumaker, the Distribution Manager at the plant.  (Id., p. 157.)   Mr. Styer acknowledged that Ms. Heiss followed up directly with Mr. Schumaker about this matter, and that she reviewed parking lot surveillance video, but did not see any evidence that anyone had approached the plaintiff's vehicle.  (Id., pp. 159-60.) Additionally, the plaintiff attested that Ms. Heiss followed up with him to see whether or not the mechanic had discovered any evidence of tampering, but that the plaintiff did not respond to her voicemail messages.  (Id., p. 162.)

The plaintiff apparently believes that Ms. Heiss could have done a more fulsome investigation, including interrogating other employees, but that he did not really know what else she could have or should have done, and he did not believe that Ms. Heiss harbored any ill-will about the matter.  (Styer Dep., pp. 163-64.)  Aside from the plaintiff's own assertions that somebody must have tampered with his vehicle – which could not be corroborated – and aside from his own speculation that they did so for discriminatory or retaliatory purposes, there is no evidence to support this claim.

### 8.    Eighth Alleged Incident

Another matter occurred that caused the plaintiff grave concern, something he alleged was the most "malicious" and the "most egregious" incident he faced, involved alleged tampering with safety equipment that is used in a manlift or "picker" that is used to raise and lower handlers in the air.  (Styer Dep., pp. 165-67.)  As it turns out, there is no evidence at all to show that this incident was racially motivated, let alone a deviation from standard practice at the plant.

While using the picker, handlers are required to wear a safety harness that is attached to a retractable wire lanyard; the harness is intended to prevent the handler from accidentally falling in case of an accident.  (Styer Dep., pp. 167-68.)  The lanyard is attached to a spring-loaded retractor that is affixed to the lift itself.  (Id., p. 168; Heiss Dep., pp. 96-97.)   The record indicates that on one occasion, the plaintiff lowered the picker and left for a break.  In doing so, Styer removed the harness from his body but kept the lanyard attached.  (Styer Dep., pp. 168-69.)  Upon returning to the picker, the plaintiff discovered that the lanyard had been detached from the harness, which would render it useless in the event of a fall.  (Id.)  The plaintiff reported this matter to Ms. Heiss and another supervisor, who then reviewed surveillance video to determine who might have detached the lanyard, and concluded that it was likely Warren Hamilton, another co-worker.  Notably, Hamilton was a

certified trainer in fall protection and proper use of safety harnesses, and he acknowledged that indeed he had removed the lanyard from the harness, which was his custom when he encountered a picker that was not currently being used. (Heiss Dep., pp. 245, 248; Hamilton Dep., pp. 56-57, 59-60.)

The plaintiff was invited to view the video that showed the incident. (Styer Dep., pp. 181-82.) Supervisory staff went even further, however, and interviewed an additional three employees about practice in the plant, and all of these workers confirmed that lanyards should be removed from their harnesses whenever a picker is not in use. (Styer Dep., p. 176; Heiss Dep., p. 255.) Mr. Hamilton testified that the reason for this practice is to ensure that tension is released from the spring inside the retractor, in order to guard against stress and damage that may occur, since failure to remove the lanyard wire could cause it to bend and eventually become compromised. (Hamilton Dep., pp. 56, 62; Heiss Dep., p. 101.) Moreover, the investigation into the plaintiff's complaint showed that handlers are, in fact, taught to remove the lanyard wire from the harness when they were not using the picker, and then to carefully check to re-attach the lanyard to the harness when coming back to use the machine. (Heiss Dep., p. 247; Styer Dep., 183-84; Hamilton Dep., pp. 68-69.) Employees confirmed that this remains the practice at the plant. (Appendix, Ex. G, Dep. of Michael Dube ("Dube Dep."), pp. 88-89; Hamilton Dep., pp. 56, 64-65, 69, 75.)

33

Thus, following what appears clearly to have been a comprehensive investigation into the plaintiff's complaint of tampering, Ms. Heiss concluded that there had been no improper motive in Mr. Hamilton's removal of the lanyard from the harness.  (Styer Dep., p. 192; Heiss Dep., p. 254.)  Inexplicably, in the face of uncontradicted evidence that an investigation had been conducted, and conclusions reached, the plaintiff simply insists that "absolutely nothing" had been done in response to his complaint.  (Styer Dep., p. 192.)  The plaintiff testified that an investigation had been undertaken, yet in his subsequent declaration he tries to present a different picture, declaring that "Ms. Heiss never met with me to look at the equipment or discuss the incident," and that he had no idea what steps she may have taken in response.  The court should reject this belated attempt to create an appearance of a dispute in the record, since the evidence is overwhelming – including evidence provided by the plaintiff himself under oath – that an immediate and fulsome investigation was undertaken in response to this latest complaint of misconduct, and it was found to be baseless.  There is no evidence in the record of any kind to suggest that the acknowledged removal of the harness had been done for a discriminatory or other invidious purpose.

\

9.      **Ninth Alleged Incident**

In January 2012, the plaintiff saw what he again believed were cigarette burns on his car while it was parked in the plant parking lot.  This again caused the plaintiff anxiety and alarm, and instead of going to Marybeth Heiss, he took his complaint directly to Barbara Buchanan, the Regional Vice President who had responsibility over the York plant, in addition to other regional facilities.  (Styer Dep., pp. 196-98.)  The plaintiff told Ms. Buchanan that he believed the cigarette burns and other "suspicious, egregious, nefarious acts" had been done in discrimination or retaliation against him.  (Styer Dep., pp. 199-200.)   In addition to alerting Ms. Buchanan, he also left a message for Ms. Heiss.  When she picked up the message, the record shows that she made repeated efforts to contact the plaintiff by phone, and even traveled to the plant on the night she received the message during the third shift in order to speak to the plaintiff directly.  (Heiss Dep., pp. 321, 334.)  Ms. Buchanan also took efforts to find and contact the plaintiff, and also contacted Ms. Heiss to take steps to find the him.  (Heiss Dep, Attach. B-4, email.)  Despite the steps that were taken, Ms. Heiss found no evidence to substantiate the plaintiff's most recent claim that he was being targeted and that his car was being tampered with.

The plaintiff, in his declaration, claims that no Caucasian employees had ever had their vehicles tampered with, but there is nothing in the record to show how the

35

plaintiff could possibly know this, and he apparently never attempted to take discovery that might have substantiated this assertion. Thus, notwithstanding the plaintiff's own subjective reports and claims, there is no evidence to show that the vandalism, even if it happened, occurred at the York plant, or who did it, or that if it was in fact done, that it was done for a discriminatory reason. The plaintiff's claim that this incident is further example of a racially hostile work environment simply lacks evidence.

### 10.    Tenth Alleged Incident

It appears that the one of the few incidents in which explicitly racial language was used in the workplace occurred at one point when John Snelbaker was overheard using the "N" word at work. It does not appear that Snelbaker was directing this word at any employee, but was instead complaining about music that was being played loudly in the plant in which the lyrics included use of the "N" word. (Styer Dep., p. 202.) Indeed, Styer admits that Snelbaker never directed that word at him, or called him by a racial epithet; the evidence shows only that Snelbaker was annoyed that the music was being played, and that the lyrics contained offensive language. (Id.) Apparently, an employee complained about the incident, and Snelbaker was disciplined, after which he never again uttered the word for any purpose. (Styer Dep., pp. 207-08.) Thus, in the only incident in which a racially-offensive word was uttered in the workplace – outside of the plaintiff's hearing, and not directed towards him or

any other employee – and where that incident was promptly and effectively addressed, the record does not support a finding of a racially hostile work environment, as explained further below.

### 11.    Eleventh Alleged Incident

Lastly, the plaintiff complains of an incident in which a worker on the first shift, sometime in 2010, referred to a white co-worker as a "wigger", although the plaintiff admittedly never heard the word uttered.  (Styer Dep., pp. 203-04.)  Instead, the plaintiff claims that he heard that the employee had used the word on a social media website, which the employee accessed from his personal computer at home.  Thus, the word was not even uttered in the workplace, or in the plaintiff's presence, but instead was used in a private Facebook message that had been sent to a coworker, and was not otherwise viewable by the public.  (Appendix, Ex. H, Deposition of Thomas Hersh ("Hersh Dep."), pp. 23-24.)  The plaintiff does not adequately demonstrate how this private exchange, which was neither directed at him, or even heard or read by him, was discriminatory, or that it contributed to a racially hostile work environment that was so intolerable that the plaintiff felt compelled to resign.

### D.     Plaintiff's Claims Fall Short of What is Required to Prove Racial Discrimination or Harassment, or to Prove Constructive Discharge

The parties are generally in agreement with what is by now the well-settled law governing claims of racial discrimination giving rise to a hostile work environment. In order to prevail on such a claim, a plaintiff must demonstrate that (1) he suffered intentional discrimination based upon his membership in a protected class; (2) the discrimination was severe or pervasive; (3) he was detrimentally affected by the discrimination or harassment; (4) the discrimination would have detrimentally affected a reasonable person in his position; and (5) there is a basis for vicarious liability. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996). Although Frito-Lay argues that the plaintiff cannot prove any of the foregoing elements, they focus their argument on the second and fifth elements, arguing that the plaintiff cannot show that the alleged discrimination or harassment he perceived was severe or pervasive, and that Frito-Lay's response was immediate and effective in all instances, and thus *respondeat superior* liability will not lie. The defendant thus posits that the plaintiff cannot make out a *prima facie* case, and lacks sufficient evidence to prove his claims of discrimination.

In order to show that a hostile work environment exists, a plaintiff needs to demonstrate harassment that is so severe or pervasive that it actually alters the conditions of the plaintiff's employment and gives rise to an abusive environment. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).   Thus, "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Faragher, 524 U.S. at 788).  In order to determine if the complained-of conduct is sufficiently egregious, courts are to "consider the totality of the circumstances," Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990), so that the analysis "concentrate[s] not on individual incidents, but on the overall scenario." Id. at 1484; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").  In making this assessment, courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

We have recounted the 11 incidents of which Styer specifically complained, and which he highlighted in his effort to demonstrate that he was targeted because of his race and subjected to harassment that resulted in a toxic and hostile work environment

that wound up causing him to feel compelled to leave his job.  Although the defendant has focused its arguments on the second and fifth prongs of the five-part test, we are constrained to note that the evidence we have reviewed simply does not support a claim that the plaintiff was harassed on the basis of race, as there is nothing other than the plaintiff's own subjective perception – or indeed speculation – that this was the reason for any adverse interactions he had with co-workers.

Moreover, there is not sufficient evidence to show that the complained-of conduct was so severe or pervasive to have fundamentally altered the terms and conditions of the plaintiff's employment.  With the exception of two or three of the incidents, none of the others of which Styer complains appear to have been based upon race, even assuming they occurred.  The investigations into these incidents, all of which Styer complained about to supervisory employees, were undertaken promptly, did not corroborate Styer's claims in many cases, and did not reveal a racial motive behind any of them.  Indeed, many were unsubstantiated and sometimes were shown to have been done for entirely legitimate reasons (e.g., removal of the lanyard from the harness on the picker).  We can perceive only one incident, where Mike Dube made a reference to "you people", where the plaintiff was subjected to an utterance that was directed to him that he perceived, and arguably could have been, racially motivated; but this incident was addressed promptly and never occurred again.  In the case of

John Snelbaker's outburst about the use of the "N" word in music that others were playing at work, it was apparently not directed at the plaintiff, and he may not even have heard it.  Regarding the Facebook posting including the word "wigger", it was not directed at the plaintiff, was posted by an employee in a private message, and seems to have had no impact at all upon the work environment.

Even if it did, however, the Supreme Court has cautioned that "offhanded comments and isolated incidents" will not be "considered severe or pervasive enough to constitute a hostile work environment." Caver, 420 F.3d at 263 (quoting Faragher, 524 U.S. at 788).  Instead, "[c]onduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.  The evidence is nowhere near sufficient to show a hostile work environment based upon the plaintiff's own testimony alone.  See also Page v. City of Pittsburgh, 114 App'x 52 (3d Cir. 2004) (a series of incidents over one month, complaints that did not relate at all to race, did not amount to racial harassment).

The plaintiff is also claiming that he faced not only racial discrimination, but also retaliation, under Title VII.  In order to sustain this claim, which is substantially similar to a claim for discrimination, a plaintiff must also show that the evidence, viewed in its entirety, demonstrates a retaliatory motive. Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co.

41

v. White, 548 U.S. 53 (2006).  Thus, we must consider whether any of the allegedly

harassing conduct that has been identified could also be found to have a retaliatory

animus.  Id. at 449-50.  In order to support a claim for retaliation, the conduct must

also be shown to be severe or pervasive.  In this regard, courts are also advised to be

mindful that where employees complain about the conduct of others, it may inspire a

change in working relationships; but "what the statute proscribes is retaliation, not

loyalty to an accused coworker or a desire to avoid entanglement in a workplace

controversy."  Id.  Here, too, we do not find that the evidence shows conduct that was

severe or pervasive, and we find no evidence to show that the conduct of which Styer

complains was driven by retaliatory animus.

### E.   Plaintiff Cannot Demonstrate that Vicarious Liability Exists in this Case Because the Evidence is Uncontradicted that Frito-Lay Took Prompt and Effective Remedial Action in Response to His Claims

There is no dispute that all of the conduct of which the plaintiff complains was

engaged in, if at all, by hourly-paid co-workers, and not by supervisors or managers.

The law is clear that in such cases, where the person or persons alleged to have created

the hostile work environment are co-workers and not supervisors, then "liability exists

[only] where the [employer] knew or should have known of the harassment and failed

to take prompt remedial action."  Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293-

94 (3d Cir. 1999).  Such "prompt remedial action" is conduct by the employer that is

42

"reasonably calculated to prevent future harassment." Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997) (citing Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997)).  Any remedy that actually stops the harassment has been found to be per se adequate and effective.  Jensen, 435 F.3d at 453.  However, even if the remedial action is not effective, it will still be adequate as a matter of law if it is "reasonably calculated" to end the harassment.  Young v. Temple Hosp., 359 F. App'x 304, 308 (3d Cir. 2009) (citing Knabe, 114 F.3d at 412-13).

The record is manifest that with respect to each of the incidents upon which the plaintiff predicates his claims in this case, Frito-Lay took prompt and effective action, including to convene meetings among Styer and his co-workers; or to investigate his claims in an effort to substantiate them, which was often unsuccessful because of a lack of evidence.  In other cases, such as his threshold complaint that his EP numbers were being tampered with, Frito-Lay supervisors not only demonstrated the impossibility of the conduct Styer alleged, but actually took steps to continue his probationary period in an effort to help him succeed.

Marybeth Heiss consistently responded to, followed up, and investigated the plaintiff's allegations; even inviting him and third parties to contact her if they had any information that could possibly substantiate his allegations regarding vandalism to his car.  There are no disputed issues of fact that could place in doubt the overwhelming

showing that she was unfailingly responsive to the plaintiff's complaints, which were frequent over 18 months, and in many instances without factual basis in any event. Barbara Buchanan, the Regional Vice President, went so far as to give the plaintiff her personal cell phone number and other means of contacting her, and in fact was immediately responsive to the plaintiff when he reached out to her with concerns. (Styer Dep., pp. 154-55.)   There is nothing in the record that suggests that these supervisory employees were anything other than responsive to his requests and complaints, or that their responses were ineffective.

In the three cases where arguably racial language was used, management took steps to meet with Styer and the offending employee and to ensure that the words were not uttered again.   The record shows that these efforts were successful, notwithstanding the plaintiff's belated effort to suggest otherwise in his declaration, which itself contradicted his earlier testimony.

For all of the foregoing reasons, we conclude that the record demonstrates that the plaintiff has failed to show that he was discriminated against or retaliated against on the basis of his race; or show conduct that was severe or pervasive; or show that management was anything other than prompt and effective in responding to the plaintiff's numerous charges, most of which were found to be unsubstantiated by any evidence after an investigation was conducted.   Accordingly, it will be recommended

that the court grant summary judgment in Frito-Lay's favor with respect to the plaintiff's Title VII discrimination and harassment claims.

### F.     The Plaintiff's Constructive Discharge Claim Fails as a Matter of Law

We note that the plaintiff has also claimed that he was constructively discharged from his employment.  Because we conclude that there is no disputed issues of fact that would permit trial on the plaintiff's claims for either racial discrimination or retaliation, we also find that the plaintiff's constructive discharge claims fails as a matter of law.

To prove constructive discharge a result of a hostile work environment, a plaintiff must prove that the employer "'knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'"  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)). Such a claim requires that a plaintiff demonstrate "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006).  In this case, the plaintiff has not adduced evidence to make a *prima facie* showing of discrimination or hostile work environment, and there is insufficient evidence that

could support a claim of a hostile work environment under Title VII for the reasons

explained.  Thus the plaintiff's ancillary claim for constructive discharge, which is

predicated on the existence of a hostile work environment that is unsupported in the

record, necessarily fails as a matter of law.  Id.; see also Young v. Temple Univ.

Hosp., 359 F. App'x 304, 310 n.6 (3d Cir. 2009).[4]

## V.  **RECOMMENDATION**

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED

THAT defendants' motion for summary judgment (Doc. 44.) be GRANTED and the

case closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a motion or
> matter described in 28 U.S.C § 636 (b)(1)(B) or making a

---

[4]  Frito-Lay devotes substantial argument to show that even if Styer had made out an arguable case for constructive discharge, he should be found estopped to pursue such a claim on the basis of contradictory representations he made in filings with the Social Security Administration in his later application for disability benefits. The defendant thus argues that Styer had affirmatively represented that he was unable to perform his job responsibilities because of his alleged disabilities, and thus he should not be able to argue here that he was, in fact, qualified for the job he left.  We submit that the record so overwhelmingly supports the defendant's motion for summary judgment on the merits of the discrimination, harassment, retaliation, and discharge claims that it is unnecessary to engage in an analysis regarding principles of judicial estoppel and whether they might supply further reason to grant summary judgment on this claim.

recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days of being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**_S/Martin C. Carlson_**
Martin C. Carlson
United States Magistrate Judge

Dated: January 11, 2016